**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 05- (RMC)** |
| | : | |
| v. | : | |
| | : | **FILED** |
| **KRAN BELL,** | : | |
| | : | SEP 1 9 2005 |
| **SEALED**      Defendant | : | **NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT** |

**STATEMENT OF FACTS IN SUPPORT OF GUILTY PLEA**

The United States of America, through its attorney, the United States Attorney for the District of Columbia, submits the following agreed statement of facts in support of the defendant's guilty plea to a superseding criminal information filed in the above captioned case. This statement of facts is intended to provide a factual basis to support the guilty plea in this case and is not intended to be a complete statement of facts as to any of the events outlined. The defendant's signature at the conclusion of the statement attests that he believes the following facts to be true and provable by the Government's evidence. The parties to this statement of facts recognize that there are many facts and details which have not been included in this statement. In addition, this statement contains some facts of which the defendant does not have personal knowledge, and by acknowledging those facts the defendant is merely indicating that he believes those facts to be true and provable by the Government's evidence. If this case were to go to trial, the government's evidence would establish beyond a reasonable doubt:

**Origins of the Conspiracy and the Enterprise from Kran Bell's Perspective**

1.      The defendant, Kran Bell, was born on March 27, 1979 and raised in Silver Spring (Takoma Park), Maryland. He became acquainted with Larry Gooch when they were in middle school. As they grew older, the defendant frequently visited Larry Gooch, where he was living with

relatives in the area at                                    .gton, D.C.  He is identified by Metropolitan

Police Department ID #497-757.

## COUNT TWO - RICO CONSPIRACY

### A.    THE RACKETEERING ENTERPRISE

1. In the fall of 1996, through Larry Gooch, the defendant  became friends with Tommie

Dorsey and  Jonte Robinson.  During that Fall, Gooch, Robinson and Dorsey were involved in an

ongoing dispute with some of the residents of H Place N.E. This dispute led to  several instances

wherein Gooch, Robinson and Dorsey went to H Place and randomly discharged firearms. During

one of these forays into H Place, Tommie Dorsey (nicknamed "Pinball")  actually shot another

person in the face. This  dispute with people from H Place, N.E., was already underway when the

defendant began associating with Gooch, Robinson and Dorsey.  The defendant  participated in

jointly undertaken shooting sprees.  The defendant and these associates also generated income by

selling drugs. Frequently, the defendant  supplied Gooch, Dorsey and Robinson with weapons and

drove them in his vehicle into the  H Place N.E. neighborhood in an effort to retaliate against them

or to inflict violence on persons from that neighborhood with whom they had an ongoing dispute.

2.  Between portions of 1997 and 1998, the defendant  lived at                          and

continued to associate with Gooch, Dorsey, Robinson and their friends.  During this time, Larry

Gooch also lived with his aunt, Patricia Wills.                     reets, N.E..  They generated income

by dealing in drugs in that neighborhood and elsewhere.  During  that period of time, the defendant

regularly sold crack cocaine in and around the              St. neighborhood. On a good day for

business, he made as much as  $5,000 selling crack cocaine.

2

3. Others too were engaged in drug trafficking in 1997 through 1998 in the 18th and M Street, N.E. neighborhood. They were Joseph L. Blackson, also known as "Joe Black"; Kenneth A. Cole, also known as "Cricket"; Anthony R. Davis, also known as "Football"; Kenneth Dodd, also known as "K," also known as "K-Dog"; James D. Hill, also known as "Foxy"; Jamal Hinson; Shawn Hinson, also known as "Jack"; Jonte D. Robinson, also known as "Tay," also known as "Black" (but only in parts of 1997) ; William D. Robinson, also known as "Dee"; Tommie Dorsey, also known as "Pinball"(but only in parts of 1997); Elliott Fields, and Larry Gooch, also known as "Goo". There were others not named here who also sold controlled substances in this neighborhood.

4. As time progressed, through a combination of kinship, friendship, cooperation, common neighborhood, and common purpose to make money by selling drugs, these individuals began to view themselves as a association in fact, which they called the 18th and M Street crew. The relationship of the above individuals coalesced into a criminal enterprise that fits the legal definition of conspiracy and a racketeering conspiracy although the exact date that the conspiracy came into existence is not known.

5. At the end of 1998, the defendant was convicted for distribution of cocaine and possession of a firearm and was sentenced to a period of incarceration. He did not return to the neighborhood until his release from prison, four years later, in the spring of 2002. While he was in prison, the 18th and M Street crew continued to sell drugs and use violence to further their goals.

6. In the summer of 2002, at 18th and M Streets, N.E., Kran Bell reconnected with his former associates, and met new associates as well. Things had changed during his period of incarceration. Now, the controlled substance generating the greatest income and in the greatest demand in his old neighborhood was liquid PCP. The neighborhood at 18th and M Street N.E. had become a major

outlet for sales of cigarettes dipped in liquid PCP (called "dippers") and sales of ecstacy (MDMA) pills. Sales of these two drugs now were generating the most significant income there. The defendant resumed selling illegal drugs to generate income, and of course, began selling the two drugs that were in greatest demand by drug customers at 18th and M, that is PCP and ecstacy.

7.    While Kran Bell had several sources for PCP, ("Rico" being his most consistent supplier), John Franklin emerged as a supplier of last resort, as initially his quality was poor. Commencing in the Summer of 2002, Kran Bell routinely obtained 8 or 16 ounce bottles of PCP from John Franklin. Franklin routinely supplied him and others at 18th and M Street, N.E. with PCP. Kran Bell would pour the liquid PCP into smaller one ounce or half ounce vials for resale, or sell the PCP as one dipper cigarette at a time. In a typical transaction, Bell would purchase 8 ounces of liquid PCP for $3000 from Franklin and could sell that quantity in smaller vials of liquid or in dippers along 18th and M Street, N.E, for $8000. Kran Bell also pooled his money with other co-conspirators so that they could buy a larger quantity of liquid PCP from Franklin. Franklin usually offered a lower price per ounce of PCP if they bought larger bulk quantities of PCP. Kran Bell also had several sources for ecstasy pills and sold those at 18th and M Street, N.E., as well. There even were times when Bell made more money in one day from selling ecstasy pills than from selling liquid PCP. On some days, Kran Bell made as much as $8000 selling both PCP and ecstasy.

8.    During the fall of 2002, there were as many as thirty people acting in concert, selling controlled substances including crack cocaine, liquid PCP and ecstasy pills in the 18th and M St. neighborhood. By then, the neighborhood had the reputation in the drug community as the best place to buy PCP and ecstasy, as both were in plentiful supply. Sales of PCP, ecstasy and crack cocaine were a common and openly visible activity at the 18th and M St., N.E. neighborhood. By the Fall of

2002. the following people were associated with Kran Bell in the sale of illegal narcotics at 18th and M Streets. N.E.: John L. Franklin ( a major supplier of PCP); Joseph L. Blackson, also known as "Joe Black"; Kenneth A. Cole, also known as "Cricket"; Anthony R. Davis. also known as "Football"; Kenneth Dodd, also known as "K," also known as "K-Dog": James D. Hill, also known as "Foxy": Jamal Hinson: Shawn Hinson. also known as "Jack"; Jonte D. Robinson, also known as "Tay," also known as "Black"; William D. Robinson. also known as "Dee"; William H. Simmons. also known as "Mike": Dwaine Williams. also known as "Dwayne Williams." also known as "Scooter"; George Wilson, also known as "Shug." also known as "Donnell Mack," also known as "Herman Walker"; April Dodd: Tommie Dorsey. also known as "Pinball"; Elliott Fields. Larry Gooch. also known as "Goo"; and Regina Lenear. There were 30-40 other co-conspirators, who are not named here or in the indictment. who also sold controlled substances in the neighborhood.

9. These individuals, including others not listed, formed the core of an association in fact which came to be known as the 18th and M Street Crew. They socialized together, took pictures together at night clubs, commonly used a hand gesture in which the fingers of one hand were shaped in the configuration of an "M." announced themselves in various nightclubs as the "18th and M Street" crew, and acted in concert and in coordination with each other while engaged in drug sales. The activities of the organization affected interstate commerce, involved interstate shipments of liquid PCP, and ecstacy pills before being delivered to the neighborhood, and many of the drug customers traveled from surrounding states to purchase drugs.    Together and in various combinations, these people generated income through the sale of controlled substances in the 18th and M St. N.E. neighborhood.

10. In order to facilitate illegal drug sales and to evade detection, the defendant and others

used the apartments and houses in the 18th and M Street N.E. corridor, which were owned or leased by other people not named herein, to store drugs, money and weapons. These locations were also used for group meetings, as a place to rest and relax, as a place to sleep over, as a place to package controlled substances and as a refuge in which to retreat quickly when necessary, especially when law enforcement came into the area. The defendant and others would warn each other when law enforcement was in the area. They did so by cell phone, walkie talkies, and by yelling to one another. The association enforced and defended their territory "turf" and used force and violence if necessary to prevent others not affiliated with 18th and M Street from selling illegal drugs in their neighborhood. This association established rules as to how controlled substances would be sold on the street. For example members took turns serving customers so that everyone shared in the opportunity to make a profit. Rules also prevented other members from "cutting off" customers, that is diverting car or foot traffic from proceeding into dead end streets where other sellers were waiting, and thereby redirecting customers to one particular seller. In such manner, the organization acted in concert to coordinate their activities so that profits would be maximized and fairly distributed, and internal strife minimized.

11. The organization evolved into a well ordered business enterprise, with a principal goal of obtaining money and other things of value primarily by selling drugs. In furtherance of this objective, members committed acts of violence and other criminal acts to advance the goals and purposes of the organization. For example, Kran Bell and other members of the enterprise were involved in acquiring and redistributing wholesale retail quantities of PCP, ecstasy and cocaine base, also known as crack cocaine, for profit, to other members and associates of the enterprise and to smaller wholesale customers as well as a multitude of individual consumers who traveled to 18th and

M Streets.    Although there was no express written agreement, the association evolved into an enterprise (in the racketeering sense), and its members acted in concert to enrich the enterprise and its members; to create, maintain, and control a market place for the distribution of its controlled substances; to enforce discipline among the members of the enterprise, to protect the enterprise and its members from detection, apprehension and prosecution by law enforcement: to prevent and retaliate against acts of violence perpetrated against the enterprise and its members and to promote and enhance the reputation and standing of the enterprise and its members.

12.  Kran Bell  and other members of the enterprise acquired and possessed firearms in order to protect themselves and to further the objectives of the enterprise.  Kran Bell  routinely obtained firearms and gave or traded them with other co-conspirators.  For example, Kran Bell purchased a MAK 90 for Larry Gooch as a birthday present.  (A MAK 90 is a close assault rifle fitted with a circular drum magazine capable of holding about 100 rounds of 7.62 mm rifle ammunition).  Law enforcement officers seized this firearm in November 2004 in connection with the arrest of another co-conspirator, Kenneth Dodd.  During a period of time in 2002, Bell resided with Larry Gooch on Southern Avenue, S.E.  Kran Bell and Larry Gooch possessed and stored either in their apartment on Southern Avenue or in other co-conspirator's apartments at 18th and M St, the following firearms: a .44 Desert Eagle semiautomatic pistol, the MAK 90 assault rifle(mentioned above), a Mini-14 assault rifle, and AK -47 assault rifle, a 9 mm Glock semi-automatic handgun, a .45 cal. handgun, and a shotgun.  These weapons were then available to members of the enterprise when needed to further the above noted goals of the enterprise.

13.  Kran Bell and  other co-conspirators committed acts of violence in the 18th and M St. area and in other parts of the city including murders and armed robberies which had the purpose of

furthering the interests of the enterprise.  Members of the enterprise were involved in violent territorial disputes with residents of different parts of the city including 6th St., S.E., 21st St., N.E. and 37th St., S.E. There were numerous instances in which members of the enterprise armed themselves with weapons and fired them at other people. Many acts of such violence were perpetrated against rival drug gangs and not surprisingly, of course, the victims of these crimes did not bother to report the crimes to police.

14. From in or about sometime in 1997, and continuing thereafter up to and including November 2004, Kran Bell, and others, constituted a criminal organization which was based in the District of Columbia and which operated in various locations including, but not limited to, the block of 18th, N.E., the          k of 18th Pl., N.E., the                     block of M St., NE  and the blocks surrounding this area, in the District of Columbia. The organization, including its leadership, membership, and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is a group of individuals associated in fact. The association in fact came to be known as the 18th and M Street crew.   The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the organization.  The activities of the organization were conducted in the District of Columbia and elsewhere, and affected interstate and foreign commerce.

## B. THE PATTERN OF RACKETEERING ACTIVITY

15.   The pattern of racketeering activity through which the defendant Kran Bell, agreed with others to conduct the affairs of the enterprise consisted of some of the following racketeering

acts:

### Narcotics Conspiracy (which is Count One of the Criminal Information)

16.    From in or about sometime in 1997, the exact date being unknown, and continuing thereafter up to and including 2004 in the District of Columbia, and elsewhere, the defendant Kran Bell and other members of the RICO conspiracy did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other and with others, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute narcotic controlled substances. Such conduct is in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

17.    Specifically,  Kran Bell and other members of the RICO enterprise/narcotics conspiracy were involved in acquiring and redistributing for profit, wholesale and retail quantities of PCP, ecstasy and  cocaine base, also known as crack cocaine,  to other members and associates of the RICO enterprise/narcotics conspiracy and to smaller wholesale customers and individual drug consumers. Kran Bell agrees  that he is accountable for aggregated drug quantities of at least thirty kilograms of mixtures and substances containing PCP, at least one kilogram of ecstasy, and at least 1.5 kilograms of crack cocaine. These aggregated drug amounts  represents amounts that Kran Bell possessed with intent to distribute and distributed, and amounts that were reasonably foreseeable to him that were possessed with intent to distribute, and distributed, by co-conspirators.

### Overt Act #2 of the Narcotics Conspiracy:  Possession with the Intent to Distribute PCP on October 5, 2002

18. On October 5, 2002, Kran Bell was arrested and charged with possession with the intent

9

to distribute PCP. Law enforcement officers observed Kran Bell place a bottle into some bushes in front of _____ N.E., Washington, D.C. When Kran Bell was stopped by an officer with the Metropolitan Police Department in front of that location, he had on his possession $1647.00 and a pack of cigarettes that had been altered to prepare them to be dipped into a vial of liquid PCP. The Drug Enforcement Agency ("DEA") Laboratory examined the contraband recovered and found that in contained a mixture and substance of PCP that weighed 5.3 grams. The location of the drug stash, in front of _____ St., N.E., was within 1000 feet of Ruth K. Webb Public Elementary School.

## COUNT THREE - VICAR MURDER and

## Overt Act #1, Commission of a racketeering murder/violent crime in aid of racketeering on

## August 24, 2002

19.     On Saturday, August 24, 2002, at approximately 4:10 p.m., in front of an apartment building located at _____ ., Washington, D.C., Kran Bell encountered Andre McCarson who was complaining to another member of the enterprise, Regina Lanear, about the poor quality of a dipper (a cigarette dipped into liquid PCP) that McCarson had recently purchased from her. She declined to give him an exchange. Larry Gooch, who was with Kran Bell at the time, remarked that Andre McCarson, the customer complaining to Regina Lanear, was the same person who had robbed Bell at gunpoint a few weeks earlier when Bell had gone shopping at a sporting goods store along Minesotta Ave. Larry Gooch suggested to Bell "you should take care of him," and handed Bell a .45 caliber handgun. Kran Bell confronted Andre McCarson and stated or implied that he would resolve the customer complaint and persuaded McCarson to accompany him to the rear the of _____ ., N.E. Once they were in the alley behind _____ .Kran Bell pulled out the handgun and fired at least four shots at Andre McCarson, striking him three times. Kran Bell then

fled from the alley and discarded the weapon. The medical examiners autopsy reported that McCarson died from multiple gun shot wounds. This act of violence furthered the purposes of the enterprise because it helped to maintain, and control a market place for the distribution of its controlled substances and enforce their no refund policy: to prevent and retaliate against acts of violence perpetrated against the enterprise and its members, and to promote and enhance the reputation and standing of the enterprise and its members, and to enchance Kran Bell's reputation in the enterprise.

## COUNT FOUR - USE OF A FIREARM

### Use and Discharge of a Firearm during a Crime of Violence on August 24, 2002

20.    During the commission of the crime of violence as listed in Count Three, Kran Bell

11

used and discharged a firearm, that is a .45 caliber handgun,  to shoot  Andre McCarson, thereby

causing his death,  on August 24, 2002 within the District of Columbia.

Respectfully submitted,

KENNETH WAINSTEIN
United States Attorney

DARLENE M.SOLTYS
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 431-036
555 4th Street, N.W., Room 4826
Washington, DC 20530
(202) 514-8147

JOHN P. DOMINGUEZ
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 949-809
555 4th Street, N.W., Room 4247
Washington, DC 20530
(202) 514-7060

12

## DEFENDANT'S ACCEPTANCE

I have read the Proffer of Evidence setting forth the facts as to my participation in a conspiracy to participate in a Racketeer Influenced Corrupt Organization in violation of Title 18, United States Code, §1962(d); in a Violent Crime in Aid of Racketeering, in violation of Title 18,United States Code, §1959(a); and Use and Discharge of a Firearm during a Crime of Violence in violation of Title 18, United States Code, §924(c). I have discussed this proffer fully with my attorneys, Anthony Martin, Esquire and William Kanwisher, Esquire. I fully understand this proffer and I acknowledge its truthfulness, agree to it and accept it without reservation. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 9-15-05

**KRAN BELL**
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting the government's proffer of evidence as to my client's participation in a conspiracy to participate in a Racketeer Influenced Corrupt Organization in violation of Title 18, United States Code, §1962(d); in a Violent Crime in Aid of Racketeering, in violation of Title 18,United States Code, §1959(a); and Use and Discharge of a Firearm during a Crime of Violence in violation of Title 18, United States Code, §924(c). I have reviewed the entire proffer with my client and have discussed it with him fully. I concur in my client's agreement with and acceptance of this proffer.

Date: 5 20 05

Anthony Martin, ESQ.
Counsel for **KRAN BELL**

Date: 15 29 05

William Kanwisher, ESQ.
Counsel for **KRAN BELL**

13